## NATIONAL LABOR RELATIONS BOARD v. FUCHS BAKING CO.
### No. 14567.

United States Court of Appeals,
Fifth Circuit.

Nov. 4, 1953.

A. Norman Somers, Asst. Gen. Counsel, David P. Findling, Assoc. Gen. Counsel, Washington, D. C., William M. Pate, Atlanta, Ga., George J. Bott, Gen. Counsel, Marcel Mallet-Prevost, Robert E. Miller, N. L. R. B., Washington, D. C., for petitioner.

W. G. Ward, Ward & Ward, Miami, Fla., for respondent.

Before HUTCHESON, Chief Judge, and RUSSELL and RIVES, Circuit Judges.

RIVES, Circuit Judge.

The National Labor Relations Board petitions this Court for enforcement of its order requiring the respondent, Fuchs Baking Co., to cease and desist from interrogating employees concerning their union membership and activities, from discouraging membership in a labor organization, or in any other manner interfering with, restraining, or coercing its employees in the exercise of their right to self-organization; to reinstate and make whole two discharged employees, Donald Galvin and Gilda Galvin; and to post appropriate notices.[1] The questions presented for decision are: (1) Whether the Board properly determined

1. See Secs. 8(a) (1) and (3) and Secs. 10(c) and (e) of the National Labor Relations Act as amended, 29 U.S.C.A. Sec. 158(a) (1) and (3); also Sec. 160 (c) and (e).

that Superintendent Bingham's questioning of employees concerning their Union membership and activities constituted interference, restraint, and coercion in violation of Section 8(a) (1) of the Act; (2) whether substantial evidence on the record considered as a whole supports the Board's findings that respondent discriminatorily discharged Gilda and Donald Galvin in violation of Section 8(a) (3) and (1) of the Act.

The Board, in its brief, concedes that the record, as the trial examiner put it, "does not establish an open-and-shut case one way or another". In our opinion the Board's findings are not supported by substantial evidence.

Superintendent Bingham frankly testified that he questioned two employees concerning the Union. One of them told him that he had received his card from an employee named Taddia, and the other replied that Donald Galvin had given him his card. A third employee testified that Bingham asked him if he had signed a card and that he said he had not. That was the extent of the questioning. The employer had no anti-union background; and there was no evidence of any pattern of conduct hostile to unions. Employee, Taddia, who was the first to contact the Union organizer, was never discharged, but some months later voluntarily left the respondent's employ to take another job. There was no other evidence of threats or coercion of any kind, and no statement derogatory of the Union. Under these circumstances, mere words of interrogation addressed to a few employees are more indicative of a natural business interest than of any interference, restraint, or coercion. N. L. R. B. v. Arthur Winer, Inc., 7 Cir., 194 F.2d 370, 372; N. L. R. B. v. Stratford Furniture Corp., 5 Cir., 202 F.2d 884, 886–887. Nor do we find anything coercive in Bingham's speech to the employees on the morning of March 29, 1952.[2]

2. It concluded as follows:
   "Again, about two weeks ago, it was necessary to discharge two employees who were undependable, failing to come to work on several occasions without good reasons or calling in to let us know. These people continued to produce less satisfactory work instead of improving. The girl in this case was doing some experimental work on a method of keeping track of ingredients used by Plant No. 3. These figures never did become accurate enough to be of any use, so upon the recommendation of our accountant, the entire system was discarded as being impractical.
   "The man, in this case, became more careless in his work every day and produced less. When this man failed to show up for work, as he had many times before, without any reason and did not bother to call in, I saw no reason to let this condition continue with an employee who was getting worse all the time instead of better. After discharging this person, it came to my attention that several people assumed he was discharged because of union activity. In fact another man in my department came to me and said he had been told that he was going to be discharged because of union activity. I told this man that I had no idea who could have told him such a thing and I was not interested in knowing who it was, but whoever it was, I as-sured him that he did not have the power to get me to discharge him for that reason or any other reason.
   "I spent about one hour talking to this man, going over his past record of good work to assure him that he was not going to be discharged, even if he was engaged in union activity, and this brings up a point that I think all of you people should know.
   "Because you people live in these United States and the State of Florida, you have the right to do as you please. No one has the right to tell any one of you that you cannot belong to a union if you so desire, and no one has the right to tell you that you do have to belong to one for any reason. No one has the right to bring pressure on you in any way, either to belong or not to belong, regardless of how anyone else may think or act, you have the right to investigate and think and act according to what you believe will be best for you and I believe all of you should do everything possible to find out the true facts.
   "I have had about twelve years experience working with union people. I was not a member because anyone who is a foreman or superintendent are not included in union activities or negotiations. They cannot be a member. I bring this up so that you people need not have any fear of being discharged as long as you perform your work satisfactorily. Just

■ Donald and Gilda Galvin were hired by Superintendent Bingham at the same time on December 1, 1951. Gilda was discharged on Monday, March 10, 1952, and Donald on the succeeding day. When he hired Gilda, Bingham told her that he intended to place her in a newly created job, involving, as an experimental proposition, the checking of the ingredients withdrawn from the storeroom each week against an estimate of the ingredients needed for the goods ordered and produced each week. Gilda herself admitted that the experiment failed. No one was ever employed to take her place in that work. The respondent was under no obligation to find other work for her in its plant.

Donald was discharged on Tuesday, March 12, 1952, following his absence from work on the preceding day. Bingham told Donald that he had been absent several times, that he was a sloppy worker, that his work could be taken over by other employees, and that Bingham would not need him any more. Donald had several excusable absences; December 14–16, 1951, when he and Gilda were married, and February 20–21, 1952, when Gilda had influenza; and several absences for which there was no apparent excuse, December 31, 1951, January 29, 1952, and March 10, 1952. On the last mentioned date, when Gilda, in answer to an inquiry from Bingham, told him that Donald was sick at home, Bingham went to see for himself. Donald answered the door obviously just awakened, and Bingham testified that he seemed to him sleepy instead of sick, though of course, he could not tell.[3] Bingham's estimate was corroborated when Donald took the stand at the hearing and admitted that on the afternoon of this last absence from work he had a meeting with the labor organizer.

■ Some suspicion is cast upon Bingham's motives by the fact that Donald had been given a merit increase in pay in January, 1952, and that Bingham knew Donald to be active in organizing the department for the Union. Bingham insisted that the increase in pay was almost automatic after an employee's first two months of work.[4] Donald's union activities did not of themselves obligate his employer to keep him on the job when he failed to perform his part of the contract. With no evidence of anti-union animus, it seems to us the circumstances relied on by the Board are enough merely for suspicion or surmise, and do not amount to substantial evidence on the record considered as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 487, 71 S.Ct. 456, 95 L.Ed. 456; Rubin Bros. Footwear, Inc., v. N. L. R. B., 5 Cir., 203 F.2d 486.

Enforcement of the Board's order is therefore

Denied.

remember that you live in a free country and a free state and nobody can tell you what you have to do.

"Union members and non-union members can work side by side in the same place in the State of Florida. The decision rests entirely with each one of you as an individual whether you do or do not choose to belong."

3. "He said he had kind of a headache. Of course, it is imposible to see a headache on a person, but he didn't look sick to me. He looked sleepy. He looked like I woke him up."

4. "Q. What was the practice and custom in your department with reference to the appraisal of an employee after any particular period of time, after they first started working for you? A. Well, the supervisor in charge—We would try to give those raises every two months. Now, there are times that they are not given the raise every two months. Usually, the foreman makes out the slip, and I sign it. Unless there is something particular come to my attention, that I can test them, why, they just go through on the foreman's recommendation."