**NATIONAL LABOR RELATIONS BOARD**

v.

**ARMOUR & CO.**

No. 14321.

United States Court of Appeals, Fifth Circuit.

June 25, 1954.

John C. Carey, Counsel, Atlanta, Ga., A. Norman Somers, Asst. Gen. Counsel,

---

**626**

David P. Findling, Assoc. Gen. Counsel, George J. Bott, Gen. Counsel, Louis Schwartz, Edmond F. Rovner, for National Labor Relations Board, Washington, D. C., for petitioner.

Harold L. Langdon, Chicago, Ill., Leon Sarpy, New Orleans, La., Chaffe, McCall, Toler & Phillips, New Orleans, La., for respondent.

Before STRUM and RIVES, Circuit Judges, and DAWKINS, District Judge.

DAWKINS, District Judge.

This is a petition for the enforcement of an order of the Board, directing Armour and Company to cease and desist from certain activity at its Orlando, Florida, plant and affirmatively to offer one Robert L. Owens full reinstatement to his former position of employment, with retroactive emoluments, and to post the usual notices.

Certain background facts may be stated as uncontested. The respondent operated a branch processing and packing plant at Orlando, Florida, and for the purposes of the Act, was engaged in interstate commerce. It employed about 25 or 30 persons at the time involved herein, among whom was Owens, one of two beef-boners, who had been so employed for more than a year at the time. Early in August, 1951, United Packinghouse Workers of America, CIO, (herein called Union) began a campaign to organize respondent's employees at the Orlando plant, and employee Owens was its leader in the campaign. On August 11, the Union sent a letter to respondent claiming to represent a majority of its employees and requesting bargaining negotiations. On August 14, the Union petitioned the Board for an election. On August 17, Owens was discharged by respondent. On October 3, 1951, an election was held, resulting in the designation of the Union as representative of the employees. A contract between the Union and respondent was subsequently negotiated and executed.

On October 11, 1951, the Union filed with the Board a charge against respondent, and on April 3, 1952, the Board issued a complaint, charging respondent with unfair labor practices within the meaning of Section 8(a)(1) of the Act [1] by interrogating its employees on union activities and threatening them for engaging in such activities; and within the meaning of Section 8(a)(3) of the Act [2] by discharging Owens because of his union activities. A full hearing was had before a duly designated Trial Examiner, and the Board adopted the Examiner's findings and recommendations as its own, and issued its order on April 15, 1953.

The pertinent evidentiary facts upon which the Examiner based his conclusions may be summarized as follows:

As to the first charge—During the week after respondent received the Union's notice on August 11, one of the supervisors asked an employee if he had been approached by the union representative. Upon receiving an affirmative answer, the supervisor inquired what the representative looked like and what the employee thought of the Union. The employee gave some description of the representative but denied any interest in the Union because he had a family. The supervisor told the employee that the branch manager had heard that organization was being attempted and wanted to know who got the Union started. This same employee testified that another supervisor (Daniel, head of the beef department) had made similar inquiries of him. Owens testified that Daniel had also made similar inquiries of him and two other employees on the morning of

1. National Labor Relations Act, 61 Stat. 140, 29 U.S.C.A. § 158: "(a) It shall be an unfair labor practice for an employer—(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;"

2. 29 U.S.C.A. § 158: "(a) It shall be an unfair labor practice for an employer— * * * (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

the day Owens was discharged, but that all three denied having anything to do with the union.

At the end of the following week, one Miller applied for work with respondent and was hired as a truck driver. At the employment interview, he was asked his views on the Union and replied that if an employer treated his employees all right there was no need for a union but that a union was needed in the event of ill treatment. Miller also testified that in the following week he overheard a supervisor (Pratt, shipping clerk) tell an employee (Faulk) that when the union came in the employer was required to guarantee only 36 hours per week and the employees would not get the hours they had been getting. Pratt denied this under oath, and the Board did not call Faulk as a witness.

A few days before the election on October 3, another supervisor (Pace) approached another employee and asked him if he believed in unions. The employee replied that he did, that he had had experience with the railroad union and considered it a fine one.

As to the second charge—About two months before Owens was discharged, respondent's manager (Vassar) informed Daniel, Owens' immediate superior, that he wanted to let Owens go because he was not satisfied with Owens' work and had found him in the egg room several times, engaged in conversation. Subsequently, Vassar talked to Daniel several times about Owens' work and his visits to the egg room, but Daniel never got around to warning Owens that Vassar intended to discharge him if he did not improve. Daniel thought Owens was a good beef boner and had a personal regard for him. On August 17, Vassar told Daniel that he had seen Owens in the egg room "every time he went down the hall" and instructed Daniel to discharge Owens. Daniel did so, telling Owens that he was being discharged because of the shortage of boning cattle; but he told Owens that if he could subsist on part-time work until the winter season, he (Daniel) would talk to Vassar and attempt to have Owens re-employed.

Vassar testified that there was an acute shortage of beef at this time and that it was necessary to discharge one of the beef boners. He chose Owens, he said, because of the latter's continuous visits to the egg room away from his job.

Owens testified that he went to the egg room usually about once in the morning. He stated that when he was discharged, Daniel told him that Vassar had been told to discharge someone, but that he did not know why Owens was selected. He asked Daniel to see if he could obtain a truck driver's job, thought to be open, but Daniel returned from the office with the statement that there was no vacancy.

From these facts, the Trial Examiner concluded that the inquiries and statements by respondent's supervisory employees constituted an unfair labor practice and that Owens was discharged because of his union activities.

■ As to the first charge, the findings of the Board, even taken as admitted, show only that on four or five occasions during a period of several weeks a relatively small number of respondent's employees were asked questions which related solely to their interest in the Union and the identity of the Union representatives. Respondent had a record of complete neutrality in such affairs, although the Trial Examiner did find from these events that the policy was not followed at the Orlando plant. The record discloses no pattern of animosity or hostility toward the Union on the part of respondent's supervisory employees at Orlando; nor is there any indication in the record that the supervisors attempted in any way to translate the results of their inquiries into any action designed to discourage organization. There is scant, second-hand testimony by one employee that on one isolated occasion one supervisor told one employee (not the witness) that if the Union came in, there would be a reduction in working hours. We entertain serious

doubts as to the sufficiency of the evidence to prove this "threat"; but we find it necessary only to hold that the infrequent, isolated and innocuous statements and inquiries, standing alone as they do here, did not, in our opinion, constitute interference, restraint or coercion within the meaning of Section 8(a) (1) of the Act. N. L. R. B. v. Arthur Winer, Inc., 7 Cir., 194 F.2d 370; N. L. R. B. v. Hart Cotton Mills, Inc., 4 Cir., 190 F.2d 964; John S. Barnes Corp. v. N. L. R. B., 7 Cir., 190 F.2d 127; Sax v. N. L. R. B., 7 Cir., 171 F.2d 769.

■■■ As to the second charge, it is necessary to observe at the outset that the question is not whether Owens' discharge was inequitable or discourteous, but *whether it occurred because of his union activities*. We have examined the record (as supplemented by selected testimony printed in appendices to the briefs), and we are of the opinion that the Board's finding is not supported by substantial evidence.

The Board relied heavily upon its finding of "antiunion animus" based upon the statements and inquiries previously discussed; upon the failure of respondent's supervisors to warn Owens of his shortcomings prior to his discharge; upon the fact that no other employees were ever discharged for visiting the egg room; and upon the failure of the manager to give Owens a job as a truck driver. But there can be no doubt, and the Board actually found, that Owens did in fact visit the egg room often, beginning about two months prior to to the union activity; that there had been a drastic decline in cattle receipts; and that no one was employed to replace Owens for several months until cattle receipts increased.[3] Further, there is absolutely no testimony in the record furnished to this Court from which it can reasonably be inferred that any of respondent's supervisors knew or even *suspected* Owens was engaged in union activity at the plant when he was discharged. To the contrary, the testimony affirmatively shows that Owens told Daniel he had very little to do with the Union, substantially the same answer given by all employees to whom inquiries were addressed. The motive ascribed to respondent's manager necessarily presupposes such knowledge, or at least a firm suspicion, on his part at the time of Owens' discharge. In the complete absence of evidence, we cannot impute such knowledge by conjecture based upon hindsight. Viewed in the light of circumstances revealed to exist at the time of the discharge, the evidence supporting the Board's finding is far short of substantial. N. L. R. B. v. American Thread Co., 5 Cir., 210 F.2d 381; N. L. R. B. v. International Broadcasting Co., 5 Cir., 209 F.2d 912; N. L. R. B. v. Machine Products Co., Inc., 10 Cir., 198 F.2d 313; John S. Barnes Corp. v. N. L. R. B., supra.

For the reasons assigned, the petition for enforcement of the Board's order is

Denied.

3. The substantiality of the evidence must take into account whatever appears in the record to detract from its weight, and the reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find substantial evidence to support it, viewed in the light which the record as a whole, including the body of evidence opposed to the Board's view, furnishes. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.