**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**MIDWESTERN INSTRUMENTS, INC., Respondent.**

No. 5944.

United States Court of Appeals
Tenth Circuit.

March 6, 1959.

Rehearing Denied April 9, 1959.

Francis Sperandeo, Washington, D. C., (Jerome D. Fenton, Thomas J. McDermott, Marcel Mallett-Prevost, Fannie M. Boyls, Washington, D. C., Donald R. Klenk, New York City, on the brief), for petitioner.

R. J. Woolsey and A. Langley Coffey, Tulsa, Okl. (Farmer, Woolsey, Flippo & Bailey, Coffey & Coffey, Tulsa, Okl., on the brief), for respondent.

Before HUXMAN, MURRAH and BREITENSTEIN, Circuit Judges.

HUXMAN, Circuit Judge.

This is a conventional enforcement proceeding by the National Labor Relations Board against respondent, Midwestern Instruments, Inc., pursuant to Section 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160(e). The Board found that respondent violated Section 8(a)(1) and (3) of the Act, 29 U.S.C.A. § 158(a)(1, 3) by interrogating employees regarding their union leader-

ship and activities of fellow members, and by discharging employee B. C. Neuman because of his union leadership. Based upon its findings, it issued a cease and desist order requiring respondent to cease and desist from its unlawful conduct, reinstate Neuman, make him financially whole, and post appropriate notices. It is this order which it asks us to enforce.

■ There is substantial conflict in the evidence in this case. There is evidence from which the examiner and the Board could have found that Neuman was discharged for valid reasons and not in violation of the Act, rather than as found by the Board that he was discharged in violation of the Act. Our review is limited to an inquiry whether an examination of the entire record supports the conclusion that the Board's findings are supported by substantial evidence.[1]

There was evidence as follows: Early in March, 1957, employee Neuman sought out the Business Manager of the International Brotherhood of Electrical Workers, Local Union No. 584, AFL-CIO, and arranged with him to call a Union meeting for the purpose of organizing respondent's employees. The seven employees who attended the meeting signed Union authorization cards. The next day Neuman persuaded sixteen other employees to sign similar cards, and during the following weeks enlisted several more members. During this organization period, Charles Cart, a company employee, suggested to Production Superintendent Piester that in the event of a layoff, respondent could rid itself of union adherents by including the leaders in any reduction. Piester rejected this proposal on the ground that it would involve respondent in serious difficulties. He, however, asked Cart whether, as suggested by his layoff proposal, he knew who the union leaders were. Cart re-

plied that he did not. Piester then described an employee who a neighbor had told him was the union leader. The description fitted Neuman.

On March 19, the Union's Business Manager telephoned M. E. Morrow, Chairman of the Company's Board of Directors, and informed him of the organizational activities. Morrow told him it would do him no good to organize for he would never get a union in that plant. On the morning of March 20, just before the work shift began, Neuman engaged employee Petra Navarro in a short conversation about the Union. When Neuman left, Supervisor Lowe approached Navarro and asked her whether Neuman had discussed the Union and, in particular, whether he had tried to get her into the Union.

On the following morning, Neuman was discharged under these circumstances. It was Neuman's job as a wireman to make oscillograph harnesses, the assembly of which takes from two to three days. Upon the completion of a harness, it is the shop practice for the wireman to take the harness to the harness tester at a nearby bench and wait there for some time[2] while the harness is being tested, a process which usually takes only five or ten minutes. No supervisor had ever complained about this practice of waiting while the testing went on. On the morning in question, Neuman completed a harness, took it to harness tester Wood and watched the testing for about ten or fifteen minutes. While Neuman was waiting for the completion of the test, President G. R. Morrow entered the room and paused to talk to Foreman Lowe. During this conversation, Lowe pointed across the room toward Neuman and told Morrow, "There is the boy that caused the whole deal." A few minutes later President Morrow went to the office of Superintendent Piester and demanded that Neuman be discharged. As Neuman started back to his bench, Foreman

1. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.

2. There is some evidence that some electricians would watch the testing for only part of the time required to complete the test. There is also evidence that Neuman was observed at the testing bench for 10 or 15 minutes.

David approached him and announced, "You are slowing up production and that is a good enough reason to let you go." Neuman asked if that meant that he was being fired, and received an affirmative reply.

Later that same day, the Union's Business Agent Shaull telephoned M. E. Morrow, Chairman of the Company's Board, to protest Neuman's discharge. Admittedly, they had a heated conversation and apparently much profanity was used. According to Shaull's testimony, Morrow said that he would "fire any —— – –– —— he wanted to * * * that no —— union was ever going to organize that plant. * * * they had tried it before' and didn't have any success" and that "he would come out and clean out the whole union * * *."

█ Respondents testified that Neuman was discharged for loafing. That statement, however, must be weighed in the light of all other relevant testimony and deductions drawn therefrom. It is of some significance that no regular employee had ever been discharged for loafing or talking too much. David, Neuman's foreman, testified that he had never discharged anyone for loafing or talking too much, and that he knew of no one who had ever been discharged for that reason. There is justification for the conclusion that Neuman's dereliction in this respect became of grave concern only after it was known that he was the leader in the Union Organization movement. The antipathy and antagonism of company officials toward the Union and its aversion toward a union shop are well established by the record.

█ The evidence with respect to the violation of Section 8(a)(1) of the Act is rather meager. There is, however, no conflict in this part of the record. It stands admitted that Superintendent Piester questioned employee Cart as to the identity of the union leaders and that Foreman Lowe questioned Navarro as to whether Neuman had tried to persuade her to join the Union. Such conduct could well intend to influence the employees and interfere with the free exercise of their organizational rights under the Act.

The order of the Board will be enforced.