NATIONAL LABOR RELATIONS
BOARD, Petitioner,
v.
KELLY & PICERNE, INC., Respondent.
No. 5869.

United States Court of Appeals
First Circuit.
Feb. 14, 1962.

Allison W. Brown, Jr., Washington, D. C., with whom Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Herman I. Branse, Washington, D. C., were on the brief, for petitioner.

Robert J. McGarry, Providence, R. I., with whom Owen P. Reid and Graham, Reid, Ewing & Stapleton, Providence, R. I., were on the brief, for respondent.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

This petition for enforcement of an order of the National Labor Relations Board presents something more than the routine question of the sufficiency of the evidence to support the Board's findings of fact.

The respondent-employer is a Rhode Island corporation engaged in the real

estate business in and around the City of Providence. It sells homes already built for a broker's commission, builds new homes for sale and sells insurance. At the time of its alleged unfair labor practices it employed 24 carpenters in the new home building branch of its business. The facts essential for the Board's jurisdiction and for the jurisdiction of this court are conceded.

The respondent's carpenters began to talk about joining a union in December 1959 and eventually one of them, Anthony J. Sepe, at the request of some of his fellows, undertook to explore the procedure for accomplishing that end. He approached one Kearney, the business agent of the charging union, Providence, Pawtucket and Central Falls Carpenters' District Council affiliated with United Brotherhood of Carpenters and Joiners of America, and on March 7, 1960, Kearney met with 6 or 8 of the respondent's carpenters. A second better attended meeting was held at the Union Hall on Thursday, March 17th, at which 14 of the respondent's carpenters present signed union authorization cards. Two men signed cards on Friday, March 18th, so that by the end of that day 16 of the respondent's 24 carpenters has designated the Union as their bargaining representative.

The next afternoon, Saturday March 19th, the respondent's general supervisor of construction called Sepe on the telephone to ask what he knew about the men joining the Union and signing authorization cards. Sepe admitted that he knew about the meeting but denied knowledge that the men had signed cards. Later that afternoon Sepe went to the general supervisor's house at the latter's invitation where he repeated face to face the substance of what he had said over the telephone because, he said: "I was more or less afraid of my own job." Still later that afternoon in a telephone call to another employee the general supervisor asked whether the employee had signed a union card, whether other employees had done so and what the "gripe" was. The answers to these questions were evasive. Nothing was said in any of these conversations about an impending layoff. In none of them was there any suggestion of threat of reprisal for joining the Union or promise of reward for refraining from doing so.

On Monday morning, March 21, when the carpenters reported for work, 15 of the 24, all of whom had signed union cards, were laid off. Of the 9 carpenters retained on the payroll only one had signed. The reason given for the layoff was that the respondent had decided to change its method of doing business by subcontracting its rough carpentry work. The laid-off employees immediately reported to Kearney and he in turn telephoned to the respondent and on March 24 he met with the respondent's vice president and general manager. At that meeting and at subsequent meetings with managerial officials on March 29 and April 4 the terms of a possible collective bargaining agreement with the respondent's carpenters were discussed but no agreement was reached. The respondent at no time questioned the Union's majority status, indeed Kearney was not asked to show the union authorization cards signed by the carpenters, but the respondent's officers maintained throughout the negotiations that they would not recognize the Union unless an agreement could be reached on the terms of a contract.

The Regional Director of the Board acting on charges filed by the Union issued a complaint against the respondent on which after notice and answer a hearing was held by a trial examiner who found that the respondent had interrogated its employees in violation of § 8(a)(1), 29 U.S.C.A. § 158(a)(1), had laid off employees because of their union membership and activities in violation of § 8(a)(1) and (3), and had refused to bargain with the Union as the duly designated representative of its employees in violation of § 8(a)(1) and (5). He recommended an order he thought appropriate. The Board on review adopted the trial examiner's findings, except for

a minor immaterial matter of date, affirmed his rulings and issued an order against the respondent in the usual form, one provision of which we shall consider later in this opinion.

■■ The respondent was and is free in the sincere exercise of its business judgment to subcontract its rough carpentry work and in consequence to lay off as many of its carpenters as were needed to do the work. But it was not and is not free to resort to subcontracting as an artifice or device for discharging its carpenters to punish them for their union activity or to escape its statutory duty to bargain collectively in good faith with its carpenters' bargaining representative. The critical fact, therefore, is the underlying motive for the respondent's change of business practice. N. L. R. B. v. Brown-Dunkin Company, 287 F.2d 17, 19 (C.A.10, 1961), and cases cited.

■ The respondent contends that there were legitimate business reasons for its decision to subcontract its rough carpentry work. It says that for many years before 1960 it had subcontracted certain types of work involved in the house construction phase of its business, such as laying concrete foundations, roofing, landscaping and some outside painting, that its managerial officers for a long time before March 1960 had discussed the desirability from a business standpoint of subcontracting its rough carpentry work since it was the only variable cost of building not already subcontracted, rough carpentry costs being higher in the winter months because of bad weather, and that its decision to subcontract that work was reached before it knew of its carpenters' union activity at a meeting called on March 14, 1960, to consider its accountant's report which showed that its labor costs on the houses built during the preceding winter had exceeded estimates.

The respondent's contention has a hollow ring in view of the uncontradicted testimony of its officials that there was no economy in subcontracting rough carpentry during any season but winter when the weather was bad and full crews of carpenters could not be used, that the preceding winter had been milder than usual so that the respondent's labor costs for that winter were lower than normal for that time of year because it had been able to keep its full crew of carpenters working throughout the season, and moreover that it was not until March 25, four days after the carpenters were laid off, that any concrete step was taken to subcontract the work by getting in touch with a prospective subcontractor and obtaining his price. Clearly this evidence warrants the Board's inference that in fact the respondent's decision to subcontract was not motivated by business considerations but by the desire to frustrate its carpenters' union activity and to avoid its obligations under the Act.

■ The interrogation of employees on Saturday afternoon, March 19th, was not an unfair labor practice for the reason that the remarks of the respondent's supervisory official to the carpenters concerned contained no expression of "threat of reprisal or force or promise of benefit." Section 8(c) of the Act. And in the absence of any evidence of the respondent's prior union hostility, no veiled threat or promise can be inferred from that interrogation. An attitude of union hostility might be inferred from the respondent's unfair labor practice of Monday, March 21st, but that attitude cannot be related back to give coercive coloration to remarks made two days earlier on Saturday, March 19. The impact of interrogation on the employees determines its legality and there is nothing to show or from which it might be inferred that the interrogation of Saturday would be interpreted by the employees as coercive. But the Board's power is not limited to the correction of past unfair labor practices. It has the power to prevent the commission of unfair labor practices in the future, and in the light of the layoff on March 21 and the refusal of the respondent to bargain collectively with its carpenters, the Board could reasonably

infer that future employee interrogation, even though privileged in form, would be coercive on the employees in practical effect. N. L. R. B. v. Firedoor Corporation of America, 291 F.2d 328, 331–332 (C.A.2, 1961).

 The evidence in support of the Board's finding that the respondent had refused to bargain with the Union as its carpenters' representative in violation of § 8(a)(1) and (5) of the Act is so clear that no useful purpose would be served in analysing and discussing it in detail.

 The scope of the Board's order remains for consideration.

That order in pertinent part directs the respondent to "[r]esume its rough carpentry operations and offer to the employees named in the Appendix [those who had been discriminatorily laid off and had not in the meantime been reemployed] reinstatement to their former or substantially equivalent positions" without prejudice to their seniority or other rights and to make them whole in pay.

Perhaps a reasonable interpretation of this order is that it requires the respondent to resume its rough carpentry work only until as a matter of sincere and genuine business judgment unrelated to its carpenters' union activity it decides to subcontract that work and to do so only to the extent necessary to provide work for the discriminatorily discharged carpenters who accepted the respondent's offer of reinstatement. Indeed, we were assured by counsel for the Board at oral argument that this would be the Board's interpretation of its order. But we think the respondent is entitled to an order couched in terms of the Board's actual intention rather than in such broad terms as to place the respondent in at least technical contempt of this court should it hereafter at any future time decide, in the exercise of a purely business judgment, to change its method of home building by subcontracting its carpentry work.

It is not our function, however, to draft the Board's orders. Therefore, retaining our jurisdiction, we shall return this case to the Board for revision of its order in accordance with the views expressed in this opinion. Upon the filing of a supplemental record we shall enter an appropriate decree.