**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**HARBISON–FISCHER MANUFACTURING CO., Respondent.**

**No. 19105.**

United States Court of Appeals
Fifth Circuit.

June 20, 1962.

Melvin Pollack, Atty., N. L. R. B., Marcel Mallet-Prevost, Asst. Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., Washington, D. C., Stuart Rothman, Gen. Counsel, for petitioner.

Karl Mueller, Fort Worth, Tex., Harold E. Mueller, Mueller & Mueller, Fort Worth, Tex., for respondent.

Before HUTCHESON, WISDOM, and BELL, Circuit Judges.

GRIFFIN B. BELL, Circuit Judge.

The National Labor Relations Board here seeks enforcement of its order against Harbison-Fischer based on its finding that two of the respondent's supervisors interrogated employees concerning their union activities in such a manner as to constitute interference, restraint, and coercion within the meaning of § 8(a) (1) of the National Labor Rela-

tions Act, 29 U.S.C.A. § 158(a) (1). The complaint against the employer charged that an employee named Maddux had been discriminatorily discharged in violation of § 8(a) (1) and 8(a) (3). The complaint also charged that Nelson and Burns, two supervisory employees, violated § 8(a) (1) in conversations with certain employees. The Trial Examiner recommended dismissal of the complaint as to Maddux's discharge. He found that Supervisor Nelson violated the Act in conversations with employees Holmes, Slimp, and Maddux, and that Superintendent Burns violated the Act in a conversation with employee Bailey. The Board adopted the Examiner's findings and recommendations.

It is our view that the employer violated § 8(a) (1) of the Act by activity of such nature as might reasonably be said to interfere with the free exercise of employee rights under the Act. While it is true that there was no evidence that the employer had any history whatever of labor trouble or unfair labor practices, it nevertheless exceeded legal bounds here. First, a supervisor called on an employee at his home on Sunday seeking to have the employee verify the names of those who were pushing the union. This conduct was not neutralized by having the supervisor inform the employee simultaneously that it was his right to sign a union card. This event was such that the employee gained the impression that the supervisor was worried about him signing a union card. Next, this same supervisor stated to another employee that the union would not be too bad in his opinion but that the company president could not see it, thus indicating presidential opposition. He also inquired of another employee if he had anything to do with the union and upon receiving an affirmative answer inquired as to how many union cards were signed. The supervisor responded upon receiving the answer of forty that he had heard there were forty one, thus indicating close surveillance. Later, another supervisor asked the employee heading the union movement to name the fifty people that he was representing for the union.

The examiner, who had the opportunity of hearing the witnesses and judging their demeanor, and whose findings were approved by the Board, found that such expressions of concern and the opposition of the president tended to cause employees to fear the consequences of union activity and membership and were violative of the Act under the circumstances involved.

Proscribed coerciveness could be inferred from this activity when considered in totality. The visit to the home of the employee in an effort to obtain the identity of those pushing the union viewed in the context of the other stated conduct took the matter beyond innocuous inquiry and into the realm of unlawful interference.

The facts here are somewhat more compelling toward enforcement than those in our case of N. L. R. B. v. Armour & Co., 5 Cir., 1954, 213 F.2d 625, and are more nearly comparable to those in N. L. R. B. v. Mid Western Instruments, Inc., 10 Cir., 1959, 264 F.2d 829, where enforcement was granted and where it was said:

"The evidence with respect to violation of § 8(a) (1) of the Act is rather meager. There is, however, no conflict in this part of the record. It stands admitted that Superintendent Piester questioned employee Cart as to the identity of the union leaders and that Foreman Lowe questioned Navarro as to whether Neuman had tried to persuade her to join the Union. Such conduct could well intend to influence the employees and interfere with the free exercise of their organizational rights under the Act."

This conduct of the employer was not rendered permissible as free speech under § 8(c) of the Act as it was neither the expression of a view, argument or opinion as there contemplated.

Interference, restraint and coercion within the meaning of the Act de-

pend upon the facts and circumstances of each individual case and our inquiry must be directed to the evidentiary basis for the order of the Board. Sufficient basis existing for the order, it should be and is

Enforced.

WISDOM, Circuit Judge (dissenting).

I have serious misgivings about the majority decision. In my view, the evidence of employer wrongdoing is so sparse and insubstantial that it cannot support a finding of "interference, restraint or coercion" as is required to establish a violation under Section 8(a)(1) of the Act.

I recognize of course that the sanctions invoked here involve little more than wrist slapping. The company is ordered to cease and desist from interrogating employees or in any like manner to interfere with, restrain, or coerce its employees in the exercise of rights guaranteed in Section 7 of the Act. The only affirmative action required is the posting of a notice that the company will not interrogate its employees or in any like manner interfere with their union activities. But respondent has the right not to have its wrists slapped unless it has committed an unfair labor practice. This case is therefore significant, as a determination of the limits placed upon employer conduct during a union organizational campaign.

The parties have no serious dispute and I have none with my colleagues on the facts of the case. The respondent manufactures oil well equipment at Fort Worth, Texas. Local 1591, International Association of Machinists, AFL-CIO, began a campaign to organize Harbison-Fischer's plant in August 1960. On four occasions during the two-week period at the end of August and first of September Harbison-Fischer officials questioned employees about the union. On Sunday, August 28 Supervisor Buster Nelson called on David Holmes at his home and asked him to come out to his car to talk. Holmes testified:

"[H]e asked me what about this union and I told him I knew it was going around but I didn't know much about it. He asked me would I verify the names if he was to call the ones who was pushing the union, and I told him I didn't know who was pushing it or nothing. He called Bailey's and Maddux and—he called a couple of other names. I didn't know one of the names and I can't think of the other boy he called. *Buster Nelson told me, he told me it was my right to sign a union card if I wanted to, that wasn't none of his business what I did, but he was worried about it, you know."* (Emphasis supplied).

At the plant Nelson asked Bobby Slimp "how the union was coming along." Slimp answered that he did not know anything about it. Nelson then said that he did not think that "the union would be too awful bad, but that Mr. Harbison [the company's president] didn't see that." Nelson also asked Michael Maddux if he had anything to do with the union. Maddux answered yes. Nelson then inquired how many union cards were signed. Maddux said that around forty had been, to which Nelson responded that he had heard it was forty-one.

Hendly Bailey testified that he had complained to Mr. Harbison about certain matters concerning employment and said that the men had decided to organize. Mr. Harbison answered that he would straighten things out and that they did not need a union. About a week later plant superintendent Burns approached Bailey and remarked, "I hear you have troubles." Burns then said, "Who's the fifty people that you are representing for the Union * * * you have been down to Harbison's office and talked to him and told him a few things that I don't like * * * you have got some explaining to do to me."

Significantly, the company has no history of labor trouble or unfair labor practices. There is no evidence of any anti-union animus or activity. The re-

spondent did not engage in any of the many invidious activities that some employers have undertaken in opposing a union campaign. Company officials and supervisors made no threats against any of the union organizers. They made no statements that working conditions at the company would be made less attractive if employees voted for the union or that conditions would be improved if the employees rejected the union. The record discloses no evidence that the respondent expressed opposition to the union, as it is entitled to do under Section 8(c). Thus there is no external evidence to inject a coercive coloration into the particular instances of interrogation, if those instances do not in themselves constitute improper conduct.

Interrogation of employees concerning their union activities may be suspect, but it is not per se unlawful. It becomes unlawful when the circumstances of the interrogation place the company in a threatening position toward union organizers and sympathizers. "[I]nterrogation becomes unlawful when it is a part of the means by which the employer's hostility carries with it the purpose to retaliate against Union sympathizers and, by threat of job or other reprisals, coerce them into a vote of action which does not express their free will". N. L. R. B. v. McGahey, 5 Cir., 1957, 233 F.2d 406, 410. However, "infrequent, isolated and innocuous statements and inquiries, standing alone [do not] constitute interference, restraint or coercion within the meaning of Section 8(a) (1) of the Act." N. L. R. B. v. Armour & Co., 5 Cir., 1954, 213 F.2d 625, 628. As we stated in N. L. R. B. v. Mississippi Products, 5 Cir., 1954, 213 F.2d 670, 673, "cases hold generally that inquiries unaccompanied by threats of reprisal, express or implied, do not thwart the purpose of the Act nor constitute unfair labor practices." See also N. L. R. B. v. Hill & Hill Truck Line, Inc., 5 Cir., 1959, 266 F.2d 883, 886 and N. L. R. B. v. Fuchs Baking Co., 5 Cir., 1953, 207 F.2d 737. The decisions of this Court consistently have held that limited inter-rogation, standing by itself, does not constitute an unfair labor practice. Moreover, I know of no decision by any court that has expressed a different rule or that would support the finding of an unfair labor practice on the facts of this case.

It is certainly a fair statement that over the last twenty years cases involving the application of the unfair labor practice provisions of the National Labor Relations Act have represented one of the largest single groups of cases raised for decision by the United States Courts of Appeals. There are scores, perhaps, hundreds, of decisions under Section 8(a) (1) alone. The majority opinion cites but a single case, N. L. R. B. v. Mid Western Instruments, Inc., 10 Cir., 1959, 264 F.2d 829. An examination of the facts and opinion in that case may suggest the unprecedented nature of the instant decision. In the Mid Western Instruments case the employer was charged with interrogation of certain employees and the discriminatory discharge of a union leader, in violation of Section 8(a) (1) and (3). The evidence showed that March 19, 1957, the chairman of the company's board of directors telephoned the union's business manager and told him "that it would do no good for him to organize for he would never get a union in that plant." The following day the company discharged an employee known to be spearheading the organizational drive. The union's business manager called the Chairman of the Company's Board of Directors to protest the discharge. He had a discussion spiked with profanity in which, according to the union official's testimony, the Chairman of the Board said that he would "fire any —— — —— —— he wanted to * * * that no —— union was ever going to organize that plant." In upholding the NLRB determination that the company discharged the employee in discrimination against his union activities, the Court declared, "The antipathy and antagonism of company officials toward the Union and its aversion toward a union shop are well established by the

record." The Court found two instances when company officials had questioned employees as to the identity of union leaders and as to whether the leaders had tried to persuade the employees to join the union. It concluded that such conduct "could well intend to influence the employees and interfere with the free exercise of their organizational rights under the Act." I am unable, and I do not believe that the Court in that case attempted, to isolate these instances of interrogation from the attendant acts and atmosphere of anti-union coercion. It was the context in which the questioning occurred that gave such interrogation an ominous ring. Yet even with this backdrop of aggressive anti-unionism the Court observed that the evidence supporting the finding of a violation in the interrogation was "rather meager." It is a natural inference that in the absence of the coloring circumstances the Court would not have found the interrogation to be an unfair labor practice. The instant case, where there is not a suggestion of anti-union coerciveness, stands in rather striking contrast. I construe the Mid Western Instruments decision standing only for the well-settled proposition that interrogation accompanied by other evidence of anti-union animus may constitute an unfair labor practice.[1]

This case is far more similar to the facts underlying this Court's decisions in N. L. R. B. v. Armour & Co. and N. L. R. B. v. Mississippi Products, supra. In the Armour case the evidence shows a pattern of heavy interrogation. During the week after the employer learned of the organizational campaign a supervisor asked an employee whether he had been approached by a union representative. On receiving an affirmative answer, the supervisor asked for a description of the representative, stating that the branch manager wanted to know who had started the union campaign. That employee testified that a second supervisor had also interrogated him on the same subject. Another employee stated that he and two other employees had been asked similar questions. A new employee testified that at his employment interview he had been asked his views on the union; the employee also said that he had overheard a supervisor telling another employee that the work hours would be reduced if the union got in, although this testimony was flatly contradicted by the supervisor. There was one other instance of interrogation. What makes this evidence of interrogation stand forth in bolder relief than does the evidence in the instant case is the fact that the numerous incidents in Armour occurred in a branch plant which employed only twenty-five or thirty workers; the incidents therefore involved a substantial portion of the total employees. By contrast, the instances of interrogation in this case involved only three out of two hundred employees.[2]

In the Mississippi Products case a personnel officer of the employer interrogated one employee twice and two other employees once each, exactly duplicating the pattern of interrogation in the instant case, although it should be noted that there was a far greater total number of employees working at the plant involved in that case. The tenor of the interrogations, however, strikes me as being if anything more aggressive than the interrogations involved here. The personnel officer delivered a speech to all the employees shortly after the union drive began which was "decidedly anti-union and designed to discourage the employees from being influenced by the union workers." The officer later asked an employee whether he had attended a union meeting the prior night, and on a

1. Our decision in Mid-Western Instruments, Inc. duplicates numerous other holdings by this Court. See for example N. L. R. B. v. Stratford Furniture Corp., 5 Cir., 1953, 202 F.2d 884 and Stokely Foods v. N. L. R. B., 5 Cir., 1952, 193 F.2d 736.

2. At the hearing evidence was introduced of a fourth employee who had been interrogated, but the hearing examiner rejected that because the employee was the superintendent's own nephew.

subsequent occasion he told the worker that he had a good record and a good future with the company; he admonished him to "stay away from them boys or they'll get you in trouble." The officer asked another employee whether he knew anything about the union and on receiving a negative reply stated, "We have a few organizers around here. There's one right over there." He asked a third employee whether he knew anyone who had union cards and said that he had heard that Mullins had some. As in the Armour case, this Court ruled that the evidence of interrogation did not support or justify a finding that the employer had interfered with, restrained, or coerced the employees in the exercise of their organizational rights.

The decisions of other Circuit courts coincide with our holdings. A leading case is Sax v. N. L. R. B., 7 Cir., 1948, 171 F.2d 769, 773. There the Court ruled that an employer had not violated Section 8(a) (1) by questioning several employees as to why they were for the union and why they had not come to the employer if they had wanted a union. The Court said:

"Mere words of interrogation or perfunctory remarks not threatening or intimidating in themselves made by an employer with no anti-union background and not associated as a part of a pattern or course of conduct hostile to unionism or as part of espionage upon employees cannot, standing naked and alone, support a finding of a violation of Section 8(1). * * *

"No case has been cited and we know of none holding the view asserted by the Board here. The cases cited by the Board all involved a course of conduct of which the interrogatories as to membership and activity in a union were only a part of the whole picture. In none of them did the mere words of inquiry stand alone."

See also John S. Barnes Corporation v. N. L. R. B., 7 Cir., 1951, 190 F.2d 127.

Shortly afterwards the Second Circuit applied the same rule, holding that:

"[I]nquiries made by the manager concerning what was being done in behalf of the union, and statements as to his not liking the union, to the extent that they constituted no threat of intimidation, or promise of favor or benefit in return for resistance to the union, were not unlawful, particularly after the 1947 amendment of the Act found in § 8 (c), 29 U.S.C.A. § 158(c)."

N. L. R. B. v. Montgomery Ward & Co., 2 Cir., 1951, 192 F.2d 160, 163. In N. L. R. B. v. Arthur Winer, Inc., 7 Cir., 1952, 194 F.2d 370, cert. denied, 344 U.S. 819, 73 S.Ct. 15, 97 L.Ed. 638, that Court rejected the Board's finding of an unfair labor practice where the supervisor had discussed union activities with many of the employees and had requested and received a report on a union meeting. The First Circuit followed the Sax and Montgomery Ward decisions and held that an employer had not committed an unfair labor practice by interrogating three of his employees about their union activities in N. L. R. B. v. England Bros., 1 Cir., 1953, 201 F.2d 395. The First Circuit has reached the same result more recently in N. L. R. B. v. Kelly & Picerne, Inc., 1 Cir., 1962, 298 F.2d 895. To the same effect is the decision of the Ninth Circuit in N. L. R. B. v. McCatron, 9 Cir., 1954, 216 F.2d 212, 216, cert. denied, 348 U.S. 943, 75 S.Ct. 365, 99 L.Ed. 738, where the Court declared,

"Interrogation regarding union activity does not in and of itself violate § 8(a) (1). * * * We are of the opinion that in order to violate § 8(a) (1) such interrogation must either contain an express or implied threat or promise, or form part of an overall pattern whose tendency is to restrain or coerce."

The Sixth Circuit also has held that an employer's interrogation must be viewed in the light of the totality of his conduct and that in the absence of evidence that such interrogation expressly or implicitly coerced, intimidated, or interfered with

**744**

the employees a finding of an unfair labor practice could not be supported. N. L. R. B. v. Armco Drainage & Metal Products, 6 Cir., 1955, 220 F.2d 573, 583, cert. denied, 350 U.S. 838, 76 S.Ct. 76, 100 L.Ed. 748.[3]

Of all the cases which I have examined, I have found only one which might be considered, as lending support to the majority view and even in that case the court's announced test for determining an unlawful interrogation would rule out the majority holding here. N. L. R. B. v. Syracuse Color Press, 2 Cir., 1954, 209 F.2d 596, cert. denied, 347 U.S. 966, 74 S.Ct. 777, 98 L.Ed. 1108. In that case, however, the Board found that the interrogations carried an implied threat of reprisals, and the Court upheld the finding of an unfair labor practice on that ground. A week or two before the date for a representation election, the superintendent called five employees into his office. Each of the employees was asked whether he was a member of the union, whether he attended its meetings, and whether he was active in its behalf. The superintendent requested one of the employees: "You are among the fellows. Why don't you find out how many members there are and who they are?" There was evidence that the superintendent considered the employees selected for interrogation to be key employees and that he presumed that the discussions with them would be reported to the remaining employees. The court also placed substantial reliance on the testimony of one employee that he had answered the question whether he was a member of the union untruthfully because he felt that to admit his membership under the circumstances would put himself and the other members in an awkward spot. The court held that this testimony taken as a whole supported the finding that

the interrogation did carry a threat and therefore was unlawful. The record in the instant case exhibits none of these extreme circumstances. There is no suggestion that Nelson's or Burns's questions carried any threat or that any of the employees construed the questions in such a light. In the conversation between the Supervisor and Holmes, Holmes testified that the Supervisor said, "it was my right to sign a union card if I wanted to, that wasn't none of his business."

In an illuminating discussion of the Syracuse Color Press case the Board observed: "In such cases * * * the surrounding circumstances together with the nature of the interrogation itself imparted a coercive character to the interrogation. * * * We agree with the test laid down * * * in the Syracuse Color Press case which we construe to be that the answer to whether particular interrogation interferes with, restrains, and coerces employees must be found in the record as a whole." Matter of Blue Flash Express, Ltd., 109 NLRB 591 (1954). The Board stated its test in Blue Flash as "whether, under all the circumstances, the interrogation reasonably tends to restrain or interfere with the employees in the exercise of rights guaranteed by the Act".

I am not sure whether the majority decision is based on a rejection of the prevailing law or on a reading of the facts, but however the decision might be articulated I regard it as cutting new ice. I wish to express my opposition to this innovation. As I read the cases, it is settled law in all circuits that *mere interrogation, in the absence of unusual circumstances producing "coercive coloration," will not support a finding of an unfair labor practice.*[4]

---

3. See also Wayside Press v. N. L. R. B., 9 Cir., 1953, 206 F.2d 862 and N. L. R. B. v. Superior Co., 6 Cir., 1952, 199 F.2d 39.

4. "The interrogation of employees on Saturday afternoon, March 19th, was not an unfair labor practice for the reason that

the remarks of the respondent's supervisory official to the carpenters concerned contained no expression of 'threat of reprisal or force or promise of benefit.' Section 8(c) of the Act. And in the absence of any evidence of the respondent's prior union hostility, no veiled threat or promise can be inferred from that inter-

As I read the record, it shows the absence of circumstances that would take this case out from under the established rule. Representatives of the respondent made inquiries of only three of two hundred employees. There is no suggestion that these inquiries were intended to, or did, influence the body of employees in the exercise of their organizational rights. None of the interrogations was accompanied by any overt threat or promise; nor was there any indication or finding that the inquiries carried any implied threat which might have affected the employees immediately involved.

It seems a fair summary that this decision is based squarely on the fact that the inquiries indicated employer concern and opposition. What this decision overlooks is the practical reality that the employer inevitably will be concerned with anything that appears likely to alter or affect his employee relations. The decision overlooks or ignores the right of the employer to be opposed to a union and to express his opposition. The employer's right to voice his objections to a union, within certain limits, not only is expressly guaranteed by Section 8(c), but also is integrally related to his rights of free speech under the First Amendment. Thomas v. Collins, 1945, 323 U.S. 516, 65 S.Ct. 315, 89 L.Ed. 430.[5] When a union campaign is in progress at a plant, the subject naturally will tend to be on everyone's minds and many persons' lips. Superintendents over a period of time undoubtedly will talk with various employees on every subject of significance to the plant and innumerable subjects of only passing interest. While it is proper to require the superintendents to refrain from attempting to intimidate the employees in their attitudes toward the union, to expect them never to mention the union seems wholly out of keeping with the realities of life. The inquiries here were made sporadically over a two-week period. The times and circumstances of the inquiries, as well as the tenor of the conversations, indicates to me that they were intended as casual inquiries and probably received as such. Nothing happened, before or after the inquiries, to suggest that they formed a part of a plan to influence the employees' attitudes toward the union. Isolated and magnified, these incidents can perhaps be given a certain argumentative significance. Viewed realistically in context, I cannot escape the conviction that they are small potatoes, very small potatoes.

There once was a time when many an employer stood as an armed giant eager to ride roughshod over the rights of his employees. Intervening legislative and judicial action have disarmed him and have cut him down to size. I find no statute, no judicial precedent, and in the light of the present state of collective bargaining no public policy which will justify going the further step of binding the employer with gag and blindfold. The majority opinion creates a serious danger for the employer's constitutional rights of free speech.

I respectfully dissent.

---

rogation. An attitude of union hostility might be inferred from the respondent's unfair labor practice of Monday, March 21st, but that attitude cannot be related back to give coercive coloration to remarks made two days earlier on Saturday, March 19. The impact of interrogation on the employees determines its legality and there is nothing to show or from which it might be inferred that the interrogation of Saturday would be interpreted by the employees as coercive." N. L. R. B. v. Kelly & Picerne, Inc., 1 Cir., 1962, 298 F.2d 895, 898.

5. "[The] decision here has recognized that employers' attempts to persuade to action with respect to joining or not joining unions are within the First Amendment's guaranty. [National] Labor [Relations] Board v. Virginia Electric & Power Co., 314 U.S. 469, [62 S.Ct. 344, 86 L.Ed. 348]. Decisions of other courts have done likewise. When to this persuasion other things are added which brings about coercion, or give it that character, the limit of the right has been passed. Cf. [National] Labor [Relations] Board v. Virginia Electric & Power Co., supra. But short of that limit the employer's freedom cannot be impaired." Thomas v. Collins, 323 U.S. at 537–538, 65 S.Ct. at 326.