NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

J. WEINGARTEN, INC., Respondent.

No. 21273.

United States Court of Appeals Fifth Circuit.

Dec. 3, 1964.

Rehearing Denied Jan. 12, 1965.

or the union activities of others, from threatening its employees with discharge,. layoffs, and the elimination of overtime in the event the union was certified as bargaining representative and from threatening its employees with discharge for engaging in activity on behalf of the union.

The respondent company, J. Weingarten, Inc., operates a chain of retail grocery stores in Louisiana and Texas. In August 1960, the Retail Clerks International Association, AFL–CIO (the union) either instituted or reactivated an organizational campaign in 43 of respondent's stores, and on August 10, 1961, it filed a. representation petition with the Board. All of the incidents which are alleged to constitute unfair labor practices took place in Store No. 3 in Galveston, Texas, during the period from August through December 1961.

None of the facts are in dispute. Both of the employees who were subjected to the alleged threats and interrogation, Mrs. Jacqueline Johnson and E. R. Da-Vila, worked in the Galveston store and were members of the employee organizing committee which the union had set up within that store. The evidence established that they had signed union authorization cards in the latter part of 1960, had attended numerous union meetings,. and had openly assisted the union in its organizational effort in the Galveston store. Their pro-union activities were well-known to Patterson, the store manager. The evidence also indicated that the respondent had no prior history of unfair labor practices and that store manager Patterson had never attempted to prevent outside union organizers from visiting the store and discussing the union with the employees or contacting the members of the organizing committee.

The trial examiner based his finding of an 8(a) (1) violation in part upon Patterson's interrogation of Mrs. Johnson on two separate occasions regarding her union activity and the union activity of other employees. He also found one instance of unlawful interrogation of Da-Vila.

Lawrence Gold, Atty., N.L.R.B., Washington, D. C., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., Washington, D. C., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Elliott Moore, Atty., N.L.R.B., for petitioner.

H. L. Deakins, Jr., L. G. Clinton, Jr., Houston, Tex., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., of counsel, for respondent.

Before WISDOM and GEWIN, Circuit Judges, and HANNAY, District Judge.

GEWIN, Circuit Judge.

This enforcement petition tenders for review the question whether there is substantial evidence to support the trial examiner's conclusion that certain remarks made by one of respondent's supervisors to two of its employees had the effect of interfering with, restraining, or coercing these employees in the exercise of their right to self-organization in violation of Section 8(a) (1) of the National Labor Relations Act, 29 U.S.C.A. § 158(a) (1). The Board's order requires the respondent to cease and desist from interrogating employees as to their own union activities

In August, 1961, Patterson questioned Mrs. Johnson about a union meeting that she had attended the night before, asking her "how it went" and how many employees were present. Mrs. Johnson did not respond to the questions. This conversation was held at the lunch counter where Mrs. Johnson worked, and approximately ten customers were present, although it was not established whether they could hear the conversation.

About the same time, while DaVila was completing the forms necessary to change his status from that of part-time employee to that of regular employee, Patterson interrogated him regarding his attitude toward the union. DaVila replied that he had been attending union meetings to find out about the union. Patterson replied: "That was what he wanted you to do." During the course of this conversation, Patterson also asked, "what was the use paying union dues when the union guys be driving big cars and, you know, we be working paying their salary."

In September 1961, Mrs. Johnson resigned from her job at the Galveston store in order to work for the union. She was rehired by Patterson in October 1961. Again in November or December 1961, Patterson questioned Mrs. Johnson about a union meeting she had attended the previous evening. He asked her how the meeting went and how soon the union expected to hold its election. She answered that she thought the election would take place in the near future. Patterson then asked which employees had attended the meeting, but Mrs. Johnson refused to name them. Patterson asserted that he knew DaVila was there and could find out who else was present. He also asked what percentage of the employees in the Galveston store were in favor of the union, and Mrs. Johnson replied that about ninety per cent were pro-union.

Following this incident, two events occurred which the trial examiner treated as establishing an anti-union animus on the part of Patterson which imparted a coercive coloration to the instances of interrogation described above. On an occasion when Mrs. Johnson had come in to pick up her paycheck, an employee inquired as to the health of her little boy. Patterson, who was also present, stated: "If you would stop hanging around with those buzzards from Houston, your little boy would be all right, you wouldn't be contaminated." Mrs. Johnson also testified that on several occasions Patterson had addressed her and other employees as "Mrs. Hofer" or "Mr. Hofer." Hofer was the union organizer assigned to the Galveston store.

■ Section 8(a) (1) of the Act only prohibits activity by an employer which in some manner tends to restrain, coerce, or interfere with employee rights; it is not a proscription of all anti-union activity. Hence, this Circuit has consistently held that interrogation of employees is not illegal *per se*. To fall within the ambit of § 8(a) (1), either the words themselves or the context in which they are used must suggest an element of coercion or interference. See, e. g., N.L.R.B. v. Hill & Hill Truck Line, Inc. (5 Cir. 1959), 266 F.2d 883; N.L.R.B. v. Fuchs Baking Co. (5 Cir. 1953), 207 F.2d 737.

■ We note in this connection that the decision in each case of this type must turn on its particular facts and circumstances. Otherwise innocuous inquiries can only assume a coercive character if the context in which they are made is coercive or threatening. In the instant case the employer had no history of anti-union activity and its store manager did not interfere in any way with the visits of union organizers to the Galveston store. At the time of the inquiries, there had been no expression of hostility toward the union other than Patterson's insinuation to DaVila that union dues went into the pockets of the union leaders. Perhaps the effect of this statement is mitigated by Patterson's assurance, during this same conversation, that the company desired that its employees attend union meetings and learn about the union. It may also be significant that between the first and second interrogations of Mrs. Johnson, she voluntarily left her job

to work for the union and was rehired by Patterson. While Patterson did not refer to the union in complimentary terms, we cannot see that his occasional disparagement of the union imparted a coercive or threatening character to the interrogations of Mrs. Johnson and DaVila.[1] Since the testimony in this case is undisputed, the only issue before us is whether the Board's inference of coercion was reasonable. In light of all the circumstances outlined above, we think the Board erred in drawing the inference, and we therefore deny enforcement to that part of the order which requires that respondent cease and desist from interrogating employees as to union desires and activities.

■ The trial examiner also found that Patterson threatened economic reprisals if the union was victorious in its election campaign. In December 1961, Patterson approached DaVila during his lunch hour and asked him whether he planned to attend a union meeting that night. When DaVila answered in the affirmative, Patterson began a conversation in which he stated that "if we get that union, it would happen like the Truck Drivers Union, a lot of people would probably get laid off and all that, and that the company used to let them get all the overtime they wanted, but they cut that out when they got the union." Apparently the trial examiner believed that this statement could reasonably be interpreted as a threat that the respondent would eliminate overtime and lay off employees in the event the union won a majority in its stores. The company, on the other hand, contends that this statement merely constituted a prediction of adverse economic consequences which is protected by the free-speech proviso contained in § 8 (c) of the Act.[2] This section makes it clear that the policy of the National Labor Relations Act is to protect not only the employees' right to organize into a union, but also the employer's right to use methods which fall short of coercion in an attempt to dissuade his employees from so organizing. The test to be applied in determining whether the trial examiner's inference of coercion is supported by substantial evidence is whether, in the whole context in which the remark was made, it was reasonably subject to the construction by the listener that a union victory meant that the employer would intentionally institute economic reprisals. See Hendrix Mfg. Co. v. N. L. R. B. (5 Cir. 1963), 321 F.2d 100. In the instant case the remark itself is perhaps subject to either interpretation, although an innocuous construction seems more convincing in the context in which the statement was made. Patterson's use of an analogy to what had resulted in another election is more suggestive of a mere prediction of probable result than of a direct threat.[3] Also, Patterson was

---

1. The instant case is factually distinguishable from N. L. R. B. v. Harbison-Fischer Mfg. Co. (5 Cir. 1962), 304 F.2d 738. In that case some of the interrogations took place at the home of an employee, the supervisor told another employee that the company's president disapproved of the union, and there was evidence of close surveillance of union activities generally. Such a background of coercion is not revealed by the evidence in the instant case. Also, there is no evidence of a pattern of concerted company action to interrogate employees as to union activity and attitudes similar to that present in Martin Sprocket and Gear Co. v. N. L. R. B. (5 Cir. 1964), 329 F.2d 417. We feel the inquiries in the instant case are more nearly comparable to those held not to violate §

8(a) (1) in N. L. R. B. v. Fontainebleau Hotel Corp. (5 Cir. 1962), 300 F. 2d 662 and N. L. R. B. v. Fuchs Baking Co. (5 Cir. 1953), 207 F.2d 737. In both of those cases, there was virtually no evidence of a company policy of hostility toward the union.

2. 29 U.S.C.A. § 158(c). That section provides:
"The expressing of any views, argument, or opinion, or the dissemination thereof * * * shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

3. Compare Texas Indus., Inc. v. N. L. R. B. (5 Cir. 1964), 336 F.2d 128, 131.

merely a store manager, and his remarks would not necessarily be interpreted as reflecting the attitudes of higher management. When this equivocal remark is placed in its context—an atmosphere relatively free of any anti-union animus and totally free of any attempted interference with union organizational efforts—a conclusion that the remark constituted a threat of economic reprisal appears unrealistic. Therefore, we hold that the Board and the trial examiner erred in making the inference of coercion, and we decline to enforce that part of the order proscribing threats of economic reprisal.

■ In addition to the above conclusions, the trial examiner found one instance in which Patterson threatened Da-Vila with discharge because of his union activity. This incident occurred in December 1961, the day after the union meeting mentioned above. The conversation was held inside the produce rack at the Galveston store, where DaVila was wrapping lettuce. Undisputed testimony established that Patterson appoached Da-Vila and inquired whether he had rather work for the Retail Clerks or Weingarten. When DaVila answered that he had rather work for Weingarten, Patterson said: "Well, I heard you been organizing, passing out literature." DaVila asked how Patterson had obtained this information, and Patterson "just walked off." Under the circumstances, the trial examiner properly concluded that this statement was violative of § 8(a) (1). Unlike the interrogations and alleged threat of reprisal which are discussed above, this statement, even when considered in isolation from its context, conveys a threat of discharge. Furthermore, the inference of coercion is strengthened by the fact that the statement followed on the heels of the equivocal inquiry of the day before. Although we do not feel that Patterson's earlier inquiries and expressions of opinion about the union can be deemed a vio-

lation of the Act, it is nevertheless true that by the time this alleged threat of discharge was made, Patterson had made it clear to the employees in the Galveston store that he was concerned about the union's successes in its organizational campaign and that he disapproved of unionization. The record indicates that Patterson was responsible for the hiring and discharge of employees in the Galveston store. In these circumstances, we think that portion of the Board's order which requires respondent to cease and desist from threatening employees with discharge because of their union activity should be enforced.

The respondent attempts to explain away Patterson's threat to DaVila by asserting that Patterson was merely attempting to ascertain whether DaVila intended to quit his job so that he could work for the union. Shortly before this conversation occurred, another employee who had been a member of the organizing committee in the Galveston store had left his employment to accept a full-time job with the union. However, the evidence does not furnish any additional support which would indicate that Patterson was referring to the other employee's situation or that DaVila so understood Patterson's remark. The trial examiner, who had an opportunity to observe the demeanor of the witnesses, properly rejected this explanation as unconvincing.[4]

Although we have concluded that there was only one incident which constituted a violation of the Act, we do not consider the violation so isolated that a Board order should not issue. The order requires posting only in respondent's Galveston store, and the unlawful threat was made by the store manager to an employee who had been quite active in his advocacy of the union.

For the foregoing reasons, paragraphs 1(c) and 2(a) and (b) of the Board's order will be enforced.

4. In the case of N. L. R. B. v. Tex-Tan, Inc. (5 Cir. 1963), 318 F.2d 472, the inference that the alleged threat ac-tually referred to a similar special situation was apparently clear from the record.