## JOHN S. BARNES CORP. v. NATIONAL LABOR RELATIONS BOARD.

### No. 10316.

United States Court of Appeals, Seventh Circuit.

June 29, 1951.

Edward A. Haight, Chicago, Ill., Edward Fahy, Rockford, Ill., for petitioner.

David P. Findling, Associate Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, Richard C. Swander, George J. Bott, Gen. Counsel, Frederick U. Reel, Mark C. Curran, attorneys, National Labor Relations Board, all of Washington, D. C., for respondent.

Before MAJOR, Chief Judge, DUFFY and SWAIM, Circuit Judges.

SWAIM, Circuit Judge.

This is a petition to review a decision of the National Labor Relations Board finding petitioner, John S. Barnes Corporation, hereinafter called the "company," guilty of certain unfair labor practices in violation of § 8(a) (1) and § 8(a) (3) of the Labor Management Relations Act of 1947, 29 U.S. C.A. § 151, et seq. The company was found to have discharged and refused to reinstate three employees, Franklin, Shirk and Hudson, because of their union activities. The

company was also found to have interfered with its employees in their concerted activities by warning them that it was regularly informing itself and had obtained knowledge concerning these concerted union activities. The National Labor Relations Board filed an answer asking that the petition be denied and that this court enter a decree for the enforcement of the Board's order.

These charges grew out of the attempts of District Lodge No. 101, International Association of Machinists, referred to herein as the "union," to organize the employees at the company's plant in Rockford, Illinois, in the latter part of 1948 and early in 1949. On Wednesday, October 27, 1948, the business representative of the union gave a supply of union application cards to two of the company's employees. The next day the active organizational campaign was started. Seemingly, the most active organizer among the employees was Franklin, whose inspecting job took him through various departments of the plant. Sometime during this period of organization the union's business agent telephoned Mr. Svenson, the company's general manager, demanding a conference to discuss recognition of the union as a bargaining agent. At Svenson's suggestion this request was repeated in writing, which letter was dated November 1, a Monday.

At nine o'clock in the morning of this same day Franklin was sent to Svenson's office by Foreman Hicks who said to Franklin, "You'd better get your fighting togs on, Svenson wants to see you." A discussion between Franklin and Svenson in the latter's office resulted in the termination of Franklin's employment. The Board accepted Franklin's description of this conversation which was that Svenson greeted him with "What have you got against the John S. Barnes Corporation?" Svenson then accused him of " * * * going around on company time engaging in activities, forming a union and engaging in activities which he (Svenson) did not think was good for the majority of the people." Svenson then said that " * * * we all have to get along in this world and it just didn't seem that I (Franklin) was fitting in-

to this picture." Svenson also expressed the belief that since Franklin and the company did not seem to get along he thought perhaps it would be best if Franklin found another job and that he, Svenson, thought it best that he sever Franklin's connections with the company. Svenson then took Franklin to the pay office where he told Mr. Kent, in charge, to make out Franklin's pay check, that he, Svenson, was severing Franklin's connections with the company and that Franklin was agreeable. After Svenson left Kent's office Kent asked Franklin what it was all about and Franklin said, "Mr. Svenson found out that I was engaged in union activity and I got canned for it."

While this testimony was contradicted by Svenson, the Board found that Franklin had been discriminatorily discharged because of his union activity and ordered the company to offer him reinstatement and to make him whole as to his loss of earnings from the time he was discharged. The Board reached this result by believing the testimony of Franklin rather than the testimony of Svenson. That is peculiarly the function of the trier of the facts, based upon the sound reason that the trier of the facts when seeing and hearing a witness testify is in a much better position to judge as to who is telling the truth than is an appellate court which has only the printed record of the testimony. From our examination of the entire record in this case, we are convinced that the findings of the Board as to the discharge of Franklin are supported by substantial evidence.

On November 8, the company laid off or discharged Shirk and Hudson. Both were good workers and had considerable seniority in the plant. Both had joined the union and attended the first meeting. Shirk had distributed union application blanks to four other employees, and testified that Foreman Hicks had overheard him asking another employee if he was going to join the union (the trial examiner found that Shirk asked this employee to join the union, but Shirk's own testimony is that he only asked if he was going to join). Hudson apparently had done no organizational work. Petitioner argued that these men were laid off

because of lack of work for them, and also because Shirk tended to disrupt work by his dangerous horseplay and Hudson was neglecting his work because of outside interests.

The Board also adopted the finding of the trial examiner that these two men were discriminatorily discharged because of their union activities. Hudson testified that when he was discharged by Svenson he was told that his work had been satisfactory and that the reason for his discharge was that the company was retooling the plant and didn't need his services. Svenson at the time also told him that if the company later needed his services he would be called back. Hudson testified that at the time he was discharged he was "the oldest man on the milling machines." However, mill operators with less seniority then he were not discharged. At the time of his discharge, Hudson's sole union activity had consisted of joining, and attending one meeting. After Hudson's discharge several other men were hired in the department but the foreman testified that the particular jobs held by Hudson and Shirk had not been filled.

Shirk testified that at the time he was laid off he was called to Svenson's office where Svenson said to him, "I got bad news for you. I have to lay you off. * * * we are going to make navy tubes for the navy and we are going to retool the machines and make no more of your valve bodies and gear housings, and I won't have no more work for you." When Shirk then asked Svenson if he would be rehired Svenson answered that he did not know.

There apparently was no spirit of animosity on the part of Svenson at the time Hudson and Shirk were laid off. There was no mention of the union nor of their membership in or activity on behalf of the union. Nor was there any background or pattern of anti-union activity on the part of the company from which a reasonable inference might be drawn that these two men were discriminatorily laid off or discharged because of union membership.

We do not believe that an examination of the record as a whole discloses substantial evidence supporting the finding of the Board that Hudson and Shirk were discriminatorily discharged.

The company contends these two men were laid off because of lack of work for them; that the lack of work due to the retooling of the machines and the reduction in the volume of the business necessitated a reduction in the number of employees. The trial examiner for the Board expressly found that "the principal reason for reducing the staff was a substantial reduction in the volume of business transacted by Respondent in the fall and winter of 1948." And that "On the entire record, * * * there was economic justification for reducing Respondent's staff in November and December 1948." The trial examiner found, " * * * that the need for retooling the plant also played some part in the decision to reduce the operating staff in November and December, 1948."

In view of this record and of these findings by the trial examiner it seems clear that the slight connection of Hudson and Shirk with the union furnished no basis for the inference drawn by the trial examiner and adopted by the Board that their discharge was discriminatory. Many other employees retained by the company had been more active in the union than Hudson and Shirk.

This court in N. L. R. B. v. William Davies Co., 7 Cir., 1943, 135 F.2d 179, 183, certiorari denied 320 U.S. 770, 64 S.Ct. 82, 88 L.Ed. 460, stated concerning a similar discharge: "In Allen's situation, there is nothing except his membership in the union from which the Board might reasonably draw the inference that his discharge was because he was a member of the union. We do not think that that is sufficient evidence to support the Board's inference that Allen was discharged because he was a union man, simply upon proof that he did belong to the union. If that were true, the discharge of every union man would support the inference that it was because he was a union man."

The complaint before the Board charged the company with eight other discriminatory discharges, but the Board found that these were due to decrease in volume of business or for other valid cause.

The alleged coercive remarks which were held to violate § 8(a) (1) of the Act were all made apparently on the same day. At one of the early organization meetings of the union four employees were elected committeemen. The next morning the foreman of the department in which Hayes, one of the committeemen, worked, said to Hayes, "I see they appointed you committeeman." The same day Svenson came into the department where Hayes was working and within the hearing of Hayes asked Hicks "how the union meeting was last night." Hicks replied, "It had a big attendance from what I hear."

Later the same day two more threatening remarks were found to have been made. Employee Burkhalter (a committeeman) testified that Assistant Foreman Rudberg, in the hearing of another employee (who did not corroborate this story although he did testify), told Burkhalter, "You fellows have got a leak in your organization," and after further questioning said, "Well, Svenson knew everything that was going on as to the number of fellows at the meeting the previous night." Burkhalter also testified that, "Svenson knew everything and that he knew *who* was at the meeting the night before." (Our emphasis.) That same morning, according to the testimony of Silletti, another of the union leaders, Foreman Hicks said to him that Svenson had wanted to find out how many people attended the meeting the previous night and that he, Hicks, had told him about 30 to 40 employees.

These four separate statements, apparently all made on the same day, were also found by the Board to constitute unfair labor practices, as defined by § 8(a) (1) of the Act, in that these statements did "interfere with, restrain, or coerce employees in the exercise" of their rights "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection".

We are unable to agree with the Board in this conclusion. We recognize, of course, that spying on union activities and threats of reprisal against employees engaging in such activities may amount to the coercion which is forbidden by § 8(a) (1) of the Act. R. R. Donnelley & Sons Co. v. N. L. R. B., 7 Cir., 156 F.2d 416, 417, certiorari denied 329 U.S. 810, 67 S.Ct. 624, 91 L.Ed. 692. The circumstances there were that for thirty years the company had a "consistent, persistent, vigorous opposition to labor unions." The company refused to hire anyone who belonged to a union and promptly fired any employee who joined a union. It consistently maintained what it called a "non-union closed shop". In Montgomery Ward & Co. v. N. L. R. B., 8 Cir., 115 F.2d 700, 702, the company made use of its espionage or secret service system in its St. Paul plant to investigate the union activities and sympathies of its employees in that plant. The chief of the espionage system in talking to other employees characterized the union activity as an "effort to cause trouble within the Ward organization", and as "bad business for employees as well as the company, that it would cause trouble between the employees and the company". There was no direct evidence that any information so obtained was actually used by the company. The court there held that the evident hostility of the chief of the espionage system towards union organization together with the use of the espionage system to investigate the union activities of the employees, considered as a whole, constituted sufficient evidence to sustain the finding of the Board that the company had violated § 8(1) of the Act.

However, the courts have not considered isolated remarks or questions, which did not in themselves contain threats or promises, and where there was no pattern or background of union hostility, as coercion of the employees and as a violation of § 8(a) (1). In Sax v. N. L. R. B., 7 Cir., 1948, 171 F.2d 769, 772–773, three workers were asked by one supervisor if they were for a union and why; and another supervisor made similar remarks to another worker. At page 773 of 171 F.2d this court said: "Mere words of interrogation or perfunctory remarks not threatening or intimidating in themselves made by an employer with no anti-union background and not as-

sociated as a part of a pattern or course of conduct hostile to unionism or as part of espionage upon employees cannot, standing naked and alone, support a finding of a violation of Section 8(1)."

In the instant case the words themselves are necessary to establish the possible existence of espionage, instead of there first being established the existence of espionage which lent significance to the otherwise harmless words.

Here there was no anti-union background or pattern of conduct hostile to unionism. In the instant case the attitude and actions of the employees seem clearly to negative the idea that the company was hostile towards the union or was attempting to coerce the employees. During the period when the company's employees were being organized, the union members and those active in the organization freely discussed the organization with various company supervisors, and among themselves in the presence of the supervisors. They even solicited union memberships in front of the supervisors. Foster, an employee in the pump division, said that the supervisor in that division was in sympathy with the union activity and that the men of that department talked and joked about it "freely and above board with him (the supervisor) around." Burkhalter in describing the attitude of supervisor Rudberg at the time Rudberg is supposed to have told him that there was a leak in their organization and Svenson knew all about it, said that Rudberg said this "in sort of a kidding manner." If the company was attempting to coerce its employees by threats, it is evident that the employees were not aware of it.

In a small plant such as was here involved (86 employees at that time), and with the discussions and solicitations in the presence of the supervisors, the management, naturally, was constantly aware of the progress of the union campaign without any spying or espionage on the employees. We find in this record no substantial evidence to sustain the finding of the Board that the four accused remarks were attempts to coerce the employees.

The petition of the company requesting a review of the Board's order is granted

and the Board is directed to modify its order pursuant to the views expressed in this opinion. The prayer of the Board for enforcement of its order is granted as to the order so modified.