LUTHERAN HOSPITAL OF MILWAU-
KEE, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 76-1688.

United States Court of Appeals,
Seventh Circuit.

Argued April 6, 1977.

Decided Oct. 5, 1977.

James C. Mallien, David E. Jarvis, Milwaukee, Wis., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Ruth E. Peters, John D. Burgoyne, Attys., N. L. R. B., Washington, D.C., for respondent.

Before SWYGERT and SPRECHER, Circuit Judges, and JAMESON, Senior District Judge.[1]

SWYGERT, Circuit Judge.

In this case petitioner Lutheran Hospital of Milwaukee, Inc. seeks review of a decision by the National Labor Relations Board ("the Board"). The Board found that petitioner violated section 8(a)(1) of the National Labor Relations Act by: (1) interrogating employees about union activities; (2) sending a letter to all employees which had the effect of inviting them to report union organizational activities to the hospital's personnel director; and (3) maintaining a rule prohibiting employees from soliciting union support or distributing union literature in all areas of the hospital to which patients and visitors have access. We hold that petitioner's interrogation of employees did not constitute an unfair labor practice, but we otherwise grant enforcement of the Board's order.

1. The Honorable William J. Jameson, United States Senior District Judge for the District of Montana, is sitting by designation.

2. Section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), provides:

(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
29 U.S.C. § 157, which is section 7 of the Act, provides:

## I

Petitioner is a nonprofit 425-bed general hospital located in Milwaukee, Wisconsin which employs approximately 850 workers. On September 30, 1974, Local 1199W of the National Union of Hospital and Health Care Employees RWDSU AFL–CIO ("the union") began an effort to organize 450 to 500 of the hospital employees. The organizational campaign continued through the succeeding months.

The union filed two complaints against petitioner with the Board, contending that petitioner had committed a number of unfair labor practices during the course of the organizational campaign. The two complaints were heard on a consolidated record before an administrative law judge, who reached a decision and issued an order on February 27, 1976. The Board affirmed the administrative law judge's decision on May 27, 1976. 224 N.L.R.B. No. 36.

Petitioner now seeks review of the Board's decision insofar as it held that petitioner violated section 8(a)(1).[2] It does not dispute the administrative law judge's findings of fact, but contends that the judge and the Board drew erroneous conclusions on the basis of those findings. We shall state the facts as they become relevant to our review of the Board's decision.

## II

The administrative law judge found that the interrogation of employees by supervisors constituted unfair labor practices in two cases.

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

In the early part of December 1974, Maryanne Krenke, a surgical technician and a member of the union's organizing committee, was on a break in the hospital's coffee room. She was drinking coffee with Housekeeping Supervisor William Fisher, which she frequently did. In the course of a social conversation, Fisher, who was not Krenke's supervisor, asked her whether she had attended a union meeting held earlier that day or whether a union meeting had been held that day. Krenke replied that she did not know if there had been such a meeting, although one had actually been held. Fisher then asked Krenke how many cards were signed, how many employees were involved in the union, and when an election would be held. When Krenke replied that she did not know the answers to those questions, Fisher remarked that it could not be a good union if she did not know anything about it. This evoked Krenke's response that, as he was a supervisor, she could not discuss union matters with him, and that federal law prohibited him from questioning her about the union. Fisher thereafter refrained from asking Krenke questions about the union.

The administrative law judge concluded that Fisher's interrogation of Krenke violated section 8(a)(1) because Fisher neither explained the need for such information to Krenke nor minimized the coercive impact of the questioning by giving Krenke assurance that reprisals would not be taken for employee involvement in the union.

Again in December 1974, Ward Clerk Marion Jackson was bringing some papers to the labor and delivery room when she met Nursing Supervisor Francis Krupo. Krupo, apparently referring to the union's organizing committee, asked Jackson: "Who was [the] head of the committee?" Jackson replied that she did not know what committee Krupo was talking about. Krupo then stated that he thought she knew, ending the conversation.

The administrative law judge found that Krupo's inquiry violated section 8(a)(1). He concluded that Jackson might well have drawn the inference that the identity of the leader of the organizing committee would be used to undermine the organizational campaign, particularly because Krupo gave no reason why he wanted the information and there was no evidence demonstrating a legitimate need for it.

■ We cannot agree with the administrative law judge's conclusions with respect to either incident. This court has held on a number of occasions that an employer's interrogation of an employee will not violate section 8(a)(1) unless the questions asked, viewed in context, would reasonably induce in the employee the fear of reprisal or the anticipation of a reward. *NLRB v. Sachs,* 503 F.2d 1229, 1235 (7th Cir. 1975); *Peerless of America, Inc. v. NLRB,* 484 F.2d 1108, 1115 (7th Cir. 1973); *Utrad Corp. v. NLRB,* 454 F.2d 520, 525 (7th Cir. 1972); *Sax v. NLRB,* 171 F.2d 769, 772 (7th Cir. 1948). In examining the employer's conduct to determine whether this test was satisfied, we have noted that "courts have not considered isolated remarks or questions, which did not in themselves contain threats or promises, and where there was no pattern or background of union hostility, as coercion of the employees and as a violation of Section 8(a)(1)." *John S. Barnes Corp. v. NLRB,* 190 F.2d 127, 130 (7th Cir. 1951).

■ We are convinced that neither Krenke nor Jackson should have feared reprisal for union activities as a consequence of the questions that were asked of them. First, neither Fisher nor Krupo made threats or promises about what would happen if an employee participated in the union's organizational campaign. Second, in each case the questioner was not the supervisor of the questioned employee and therefore was not in a position to immediately discipline the employee. Third, there was no evidence that either employee had reason to believe that the supervisor questioning her had authority to speak for the hospital. *See Utrad Corp.,* 454 F.2d at 524. Finally, the record does not show that any antiunion animus contained in the supervisors' questions was part of a pattern of hostility by petitioner toward the union. Instead, the questions appear to have been

isolated remarks. Fisher stopped asking questions when Krenke asked him to do so, and never broached the subject again. Krupo did not pursue his interrogation of Jackson but instead went on his way without waiting for an answer to his question. The isolated character of both incidents reinforces our conviction that they were not coercive within the meaning of section 8(a)(1).

### III

■ The administrative law judge also found that a letter sent by the hospital's personnel director to all of its employees on January 30, 1975 violated section 8(a)(1). The letter stated:

TO ALL EMPLOYEES:

A number of employees have reported that they are being pressured to sign Union cards. Some are told that they will have to join a Union if they want to continue to work here.

You should know that—

—No one will have to join a Union as a condition of employment at the Hospital.

—No one will have to pay dues to a Union as a condition of employment at the Hospital.

—The Hospital will continue to pay wages and benefits that compare favorably with those of any other hospital in the Milwaukee area, regardless of Union or non-Union affiliation.

—You don't have to put up with pestering or pressure to join.

Please let me know if you are bothered. I will do my best to see that the law is observed.

The director testified that he sent the letter because fifteen or twenty employees stopped him in the hallway and complained that unidentified "people out on the sidewalk" were forcing union literature and cards on them, and that they resented being pressured. He further testified that, although he suggested to the complaining employees that they tell those "people" to leave them alone, the employees insisted that the hospital reply to the union's leaf-lets, take a position with respect to the union, tell the union organizers to stop bothering employees, and advise the employees of their rights.

The administrative law judge concluded that the letter was an invitation to employees to report union solicitation by fellow employees to the director. He found that petitioner's "declared interest in being informed of the identity of union solicitors can reasonably be expected to instill fear in employees of the consequences of union advocacy and thereby deter and restrain them for exercising their statutory rights." He rejected petitioner's explanation for sending the letter, noting that no complaining employee testified about an unhappy experience with the "people on the sidewalk" and that petitioner had not shown a legitimate need for the information sought in the letter.

We enforce this aspect of the Board's decision. We agree with the administrative law judge that the letter, which was sent by an official who clearly represented the hospital's management, invited employees to report the names of union organizers to the director. The letter in no way distinguished between organizing activities that are statutorily protected and conduct that is illegal in asking employees to report cases of "pestering or pressure to join." It would have been reasonable for an employee who received the letter to draw the inference that any organizational activity on behalf of the union would be reported to the director and that the identified participants in the organizational campaign would be punished.

The explanation which petitioner offers for sending the letter—that it was in response to the request of complaining employees—does not justify the coercive effect which the letter produced. First, the absence of testimony from complaining employees that they had been bothered by illegal union activity undermines petitioner's argument that it had to act to protect its employees' rights. Second, even if the petitioner had a responsibility to protect its

employees from being illegally coerced by the union while walking on the sidewalks, it could have taken whatever steps "to see that the law is observed" that it intended to pursue immediately upon receiving the complaints. In our judgment the purpose of the letter was to intimidate potential participants in the organizational campaign rather than to protect the rights of the employees, and it therefore constituted an unfair labor practice.

## IV

Finally, the administrative law judge concluded that petitioner violated section 8(a)(1) by promulgating the following rule on April 25, 1975:

> During working hours, employees should not solicit or distribute written matter for any purpose in any part of the hospital during working time. ("Working time" applies not only to the employee *doing* the soliciting, but includes the person *being* solicited.) During the non-working time of employees' working hours, solicitation is permitted only in non-patient and in non-public areas of the hospital, and distribution of written material is limited to non-work areas and non-patient areas and non-public areas. (Emphasis in original.) [3]

The administrative law judge found that the rule was void for vagueness because it did "not describe with sufficient clarity the particular areas where employees may or may not engage in union solicitation and distribution during their non-working time." Since the rule was impermissibly vague, he reasoned, it deterred employees from exercising their organizational rights because they feared that they would unwittingly commit violations. The judge alternatively held that the rule was invalid apart from problems of ambiguity because it imposed "restrictions on union solicitation and distribution during an employee's non-working time and in nonwork areas beyond those normally permissible under estab-

lished law." He recognized that a broad prohibition of solicitation and distribution might be valid under special circumstances—if solicitation and distribution in the areas in question would interfere with hospital operations or adversely affect patient care—but found that petitioner had failed to demonstrate that these special circumstances were present.

On appeal both parties have dealt primarily with the validity of the second conclusion reached by the administrative law judge—that the rule was an impermissibly broad prohibition of solicitation and distribution—rather than with the judge's initial holding that the rule was void for vagueness. Since the Board affirmed all of the judge's conclusions, however, we must first decide whether the rule is too vague to be understood before examining its substantive scope.

We do not find the language of the rule to be so ambiguous that its promulgation constituted a violation of section 8(a)(1). In most cases an employee would be able to discern whether a given location was a "public area" or a "patient area" and would therefore know whether solicitation or distribution was permitted. And although there might be borderline cases where the applicability of the rule was uncertain, we are convinced that the number of these uncertain situations would be small enough that the rule would not significantly deter employees from exercising their organizational rights for fear of unwittingly defying the hospital's policy.

We therefore turn to a determination of whether the rule's scope violates the statute. In affirming the findings and conclusions of the administrative law judge, the Board added in a footnote:

> Subsequent to the Administrative Law Judge's Decision in this case, the Board, in *St. John's Hospital and School of Nursing, Inc.,* 222 NLRB No. 182 (1976), held that a no-solicitation, no-distribution rule

---

3. The quoted language is the second paragraph of a rule entitled "Solicitation & Distribution of Material" which was printed in the employee handbook. The first paragraph of the rule is not relevant to this case.

which prohibits all solicitation and distribution in all areas to which patients and visitors have access, other than immediate patient care areas, is unlawful. Accordingly, we find, in agreement with the Administrative Law Judge, that the Respondent herein violated Sec. 8(a)(1) of the Act by maintaining an overly broad no-solicitation, no-distribution rule which prohibits all solicitation and distribution during an employee's non-working time in all nonwork areas where visitors of the public might be present. 224 NLRB No. 36, at 176.

Both petitioner and the General Counsel for the Board agree that the outcome of this part of the case at bar turns on whether we accept the Board's holding in *St. John's,* which is the leading case in this area and was a unanimous decision by the entire Board. Since the rule promulgated by the employer-hospital in *St. John's* was virtually identical to the rule at issue here,[4] we shall treat the Board's reasoning in *St. John's* as directly applicable to this case.

In *St. John's* the Board began its analysis by stating the general rule that an employer may not prohibit solicitation of union support during nonworking time or distribution of union literature during nonworking time in nonworking areas. The general rule is applicable unless an employer affirmatively demonstrates that special circumstances require greater restrictions. *See P.R. Mallory & Co. v. NLRB,* 389 F.2d 704, 709–10 (7th Cir. 1967); *Stoddard-Quirk Mfg. Co.,* 138 NLRB 615 (1962). Since the hospital's rule, in prohibiting solicitation and distribution in areas to which patients and visitors had access, limited solicitation during nonworking time and distribution during nonworking time in nonworking areas, it was presumptively unlawful.

The Board then recognized that the hospital was justified in imposing more stringent limitations on solicitation than are generally permitted because a hospital requires a tranquil atmosphere in order to carry out its primary function of patient care. The Board therefore found that the prohibition of solicitation in strictly patient care areas, such as patients' rooms, operating rooms, and places where patients receive treatment, was justified because patients in those areas require quiet and peace of mind.

The Board also found, however, that the hospital's restrictions on solicitation and distribution in areas to which patients and visitors have access, but which are not immediate patient care areas, were not similarly justified. It reasoned that the possibility of a disruption in patient care resulting from the exposure of visitors to solicitation and distribution would be remote. It further held that patients would not be adversely affected by solicitation and distribution in areas such as cafeterias and lounges and that, in any case, the interests of patients well enough to frequent such areas were outweighed by the interests of employees in discussing union representation.

The Court of Appeals for the Tenth Circuit has recently denied enforcement of the Board's decision. *St. John's Hospital & School of Nursing, Inc. v. NLRB,* 557 F.2d 1368 (10th Cir. 1977). The court refused to accept the Board's distinction between patients who are well enough to visit such areas as cafeterias and lounges and other patients, holding that there was no evidence that ambulatory patients are better able to withstand the unsettling effects of solicitation than patients who are confined to their rooms. It also rejected the Board's basic dichotomy between immediate patient care areas and other areas to which patients have access on the ground that "it is unreasonable to conclude that [the] adverse effects of union solicitation will occur in some patient access areas but not in others." Finally, it stated as an alternative holding that the hospital had the right to prohibit solicitation and distribution in areas such as cafeterias and gift shops, which are not

---

4. The only difference between the two cases is that in *St. John's* the hospital prohibited solicitation in employee-only working areas as well as in areas to which the public and patients have had access.

directly related to the function of patient care, because a cafeteria or a gift shop which was not part of a hospital would have the right to prohibit organizational activities in locations to which the public had access.

The petitioner in this case mounts its primary challenge to the Board's decision on the basis of the argument which the Tenth Circuit in *St. John's* accepted as an alternative holding: that the Board may not place greater restrictions on hospitals than it places on retail stores and restaurants. As petitioner notes, the Board has for many years permitted department stores to prohibit solicitation on the selling floor and in other public areas at any time. *Marshall Field & Co.*, 98 NLRB 88 (1952), *modified and enforced*, 200 F.2d 375 (7th Cir. 1953); *May Department Stores Co.*, 59 NLRB 976 (1944), *modified and enforced*, 154 F.2d 533 (8th Cir.), *cert. denied*, 329 U.S. 725, 67 S.Ct. 72, 91 L.Ed. 627 (1946). The Board has more recently allowed restaurants to prohibit solicitation and distribution in areas with which the public regularly comes into contact. *Marriott Corp.*, 223 NLRB No. 141 (1976); *McDonald's Corp.*, 205 NLRB 404 (1973). The rationale for the relaxation of the presumptions which the Board applies to the ordinary workplace is that in retail stores or restaurants the rancor which may accompany solicitation and distribution might destroy the employer's rapport with its customers, causing a serious disruption of its business.

Petitioner argues that there is no reason to suppose that a patient or a visitor in a hospital would be any less upset by the controversy which can surround a discussion of whether employees should form a union than a member of the public in a retail store or a restaurant. It contends that the special circumstances in retail stores and restaurants which rebut the ordinary presumptions with respect to solicitation and distribution are equally present in a hospital, and that the Board's distinction between the two settings is wholly arbitrary.

In support of this reasoning, it points out that prior to *St. John's* the Board rejected such a distinction and permitted hospitals to prohibit solicitation and distribution in public areas. *See Shorewood Manor Nursing Home*, 217 NLRB 55 (1975); *Guyan Valley Hospital, Inc.*, 198 NLRB 107 (1972).

In our judgment the distinction the Board has now drawn between hospitals and retail stores or restaurants is far from arbitrary. A retail store's or a restaurant's primary function is selling merchandise. The sales floor of a store and the public area of a restaurant are where either business carries out the sale of merchandise, and are also where the public deals with the employees in their professional capacity. Thus, insofar as union organizational activities create an abnormal atmosphere on the sales floor or in public areas, they interfere with the employees' job performance and disrupt the store's or restaurant's performance of its primary function.

By contrast, the primary function of a hospital is to provide health care, and the areas of a hospital outside of immediate patient care areas are by definition not locations where the hospital's primary function is carried out or where the public deals with the employees in their professional capacity.[5] Thus, while organizational activities conducted outside of immediate patient care areas might create an abnormal atmosphere where they took place, they would not interfere with the employees' job performance and therefore could not disrupt the hospital's performance of its primary function.

■ Moreover, even if we agreed with petitioner's contention that the Board's decision in *St. John's* was inconsistent with its holdings with respect to retail stores and restaurants, we would not be free to deny enforcement on this ground. It is the Board's function to determine the applicability of the National Labor Relations Act to working conditions in a particular industry in light of the special conditions present in that industry, and it is not our role to

**5.** Hospital employees who work in the cafeteria are an exception to this statement. However, they constitute only a small portion of the total number of hospital employees.

"insure an abstract and academic consistency in Board decisions" which draw distinctions between various industries. *NLRB v. Deaton, Inc.*, 502 F.2d 1221, 1228 (5th Cir. 1974), *cert. denied*, 422 U.S. 1047, 95 S.Ct. 2665, 45 L.Ed.2d 700 (1975). *See also NLRB v. Weingarten*, 420 U.S. 251, 266, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975). If the individual decision of the Board which is before us for review is supported by substantial evidence and based on correct legal reasoning, we must enforce it.

■ Nor can we deny enforcement simply because the Board in *St. John's* reversed its previous position. The Board is free to disregard its own precedents in light of its cumulative experience and changing industrial practices. *Weingarten*, 420 U.S. at 265–67, 95 S.Ct. 959.

Petitioner also challenges the Board's decision in this case on the basis of the primary ground relied upon by the Tenth Circuit for denying enforcement in *St. John's*: that the Board's conclusion, that the interests of patients well enough to frequent areas such as cafeterias and lounges is outweighed by the interests of employees in those areas, is erroneous because it is based on the faulty assumption that ambulatory patients are better able to endure any unsettling effects of solicitation and distribution than patients who are confined to their rooms. We agree with petitioner and the Tenth Circuit that this distinction is unsound. In many cases ambulatory patients are far sicker than confined patients. For example, it is implausible to suppose that a person with leukemia who is able to walk to the cafeteria is better able to accept stress than a person confined to his bed with a fractured leg. Thus, if the Board's decision rested on this reasoning alone, it could not be upheld.

However, the Board also based its decision on the ground that patients in general are not adversely affected by organizational activities in areas of a hospital such as cafeterias and lounges. In our judgment this conclusion is correct. We cannot believe that patients and their visitors who are present in these areas are likely to become "unsettled" upon exposure to organizational activities conducted by employees. Labor unions are common entities in this country, and only an extraordinary patient would be so dismayed at witnessing an attempt to form one that his health would actually become impaired.

Moreover, the Board's recognition that solicitation or distribution might be unsettling in immediate patient care areas does not undermine its holding that these activities would not be disturbing outside those locations. Solicitation or distribution might be undesirable in immediate patient care areas for two reasons. First, there is an obvious need in such areas for quiet. Since organizational activities can arouse intense emotion and create heated arguments, their prohibition, along with the prohibition of all other potentially noisy activities, is sensible. Second, these areas are the location where employees perform the function of patient care. The turmoil that could be created by solicitation or distribution might interfere with the employees' performance of their jobs, undermining the provision of that care.

But these factors are not present outside of immediate patient care areas. Patients and visitors do not require absolute quiet in cafeterias and lounges. And as we observed earlier, employees in those locations are not acting in their professional capacity,[6] so that organizational activities cannot interfere with their job performance or with the provision of patient care. Thus, a typical patient or visitor would be indifferent to solicitation or distribution conducted outside of immediate patient care areas. This is true not because a patient is "well" enough to leave his room, but because the conduct of employees in locations such as cafeterias or lounges is irrelevant to the ordinary patient.

■ We hold that the Board's conclusion, that special circumstances rebutting its usual presumptions with respect to solicitation and distribution exist in the immediate pa-

---

6. Again, cafeteria workers are an exception. *See* note 5 *supra*.

tient care areas of a hospital but do not exist outside of those locations, is both logical and just. Since petitioner's rule is invalid under the usual presumptions,[7] we must disagree with the Tenth Circuit[8] and enforce the Board's decision in this case.

We note that the Court of Appeals for the First Circuit has also recently reviewed a Board decision based on St. John's. In NLRB v. Beth Israel Hospital, 554 F.2d 477 (1st Cir. 1977), the court enforced the Board's order enjoining an employer-hospital from prohibiting distribution and severely limiting solicitation in the hospital's cafeteria and coffee shop, to which both employees and the public had access. The court concluded that the discussion of union activities in the cafeteria and coffee shop would not sufficiently upset ambulatory patients and their visitors to justify the hospital's rule. It declined, however, to approve the Board's St. John's doctrine with respect to all other locations to which patients and visitors have access, stating that the scope of the area in which it would be permissible for a hospital to prohibit solicitation and distribution should be determined by future litigation. 554 F.2d at 481–83.

We do not find our decision in this case to be in conflict with Beth Israel. In this case, unlike Beth Israel, the full scope of St. John's was called into question because petitioner prohibited solicitation and distribution in all areas to which the public and patients have access. Therefore, we are unable to confine our holding to locations such as cafeterias and coffee shops. But we agree with the First Circuit that the rationale supporting the Board's decision in St. John's is strongest with respect to these

areas, and that further litigation will be necessary to determine in exactly which areas of a hospital solicitation and distribution may be forbidden. In our judgment, however, this clarifying process can take place under the rubric of the Board's decision in St. John's as future litigation fleshes out a definition of "immediate patient care areas." This phrase is far from being unambiguous, and it will be open to hospitals to demonstrate that a particular area is functionally given over to patient care.

The order of the Board is in part granted enforcement and in part denied enforcement.

JAMESON, District Judge, concurring.

I concur fully in Parts I, II and III of Judge Swygert's well considered opinion and in most of Part IV.

I agree that petitioner's rule limiting solicitation and distribution of materials to "non-work areas and non-patient areas and non-public areas" is overly broad. On the other hand, I think the Board's order permitting solicitation in "other than immediate patient care areas" likewise is unduly broad, if not ambiguous.

While I question the wisdom and necessity of requiring a hospital to permit solicitation in public cafeterias, lounges, and gift shops,[1] I recognize that the Board's findings and interpretation of the Act are entitled to considerable deference in light of the Board's " 'special function of applying the general provisions of the Act to the complexities of industrial life' . . . and its special competence in this field". NLRB v. Weingarten, Inc., 420 U.S. 251, 266, 95

---

7. We are unpersuaded by petitioner's final argument that it ought to be able to prohibit solicitation or distribution in all public areas even in the absence of special circumstances because there are a number of nonpublic areas on the hospital grounds in which these activities would be permitted. "The availability of one channel of communications does not permit the employer to block other channels without good reason." National Steel Corp. v. NLRB, 415 F.2d 1231, 1233–34 (6th Cir. 1969).

8. This opinion has been circulated among all judges in regular active service. A majority of

the active members did not vote to grant that this conflict with the Tenth Circuit be reheard en banc. Judges Pell, Tone and Bauer voted to grant that this matter be reheard en banc.

1. Solicitation and distribution are permitted in employee locker rooms and adjoining lounges and restrooms; in the main cafeteria, utilized only by employees (from 300 to 400 a day); in employee lounge and break areas on almost every floor of the hospital; and in employee parking lots.

S.Ct. 959, 968 (1975), *quoting NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 236, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963).

On this basis, I agree with the holding of the First Circuit in *NLRB v. Beth Israel Hospital*, 554 F.2d 477 (1st Cir. 1977), enforcing the Board's order enjoining the employer-hospital from prohibiting distribution and limiting solicitation in the hospital's cafeteria and coffee shop to which both employees and the public have access. The court there, however, rejected the Board's argument that the enforcement order should extend to all non-patient care areas.[2] As the court noted (Note 6):

> [A] phrase like "immediate patient-care area" is far from self-defining given the complexity of a major metropolitan hospital. Would a waiting area by the nurse's desk on a floor where patients reside be a "patient-care area"? Would the waiting room in the emergency ward? 554 F.2d at 482–83.

In most modern hospitals there are many small visiting rooms or lounges in the vicinity of patients' bedrooms, where patients visit with relatives and friends. Are these "immediate patient-care areas"?[3]

While I would prefer a more limited enforcement of the Board's order, I concur in the court's opinion, recognizing as Judge Swygert has noted, that further litigation will be necessary to determine in exactly which areas of a hospital solicitation and distribution may be forbidden. As the court stated in *Beth Israel Hospital, supra*:

> "[The Board bears] a heavy continuing responsibility to review its policies concerning organizational activities in various parts of hospitals. Hospitals carry on a public function of the utmost seriousness and importance. They give rise to unique considerations that do not apply in the industrial settings with which the Board is more familiar. The Board should stand ready to revise its rulings if

future experience demonstrates that the well-being of patients is in fact jeopardized." 554 F.2d at 481.

---

**2.** The court concluded that the order of the Board "fairly obviously was intended to regulate only" the cafeteria and coffee shop.

**3.** As petitioner argues, it is difficult to explain "why a patient with a broken toe in the X-ray room would be adversely affected by union solicitation but a heart attack victim, sitting in the lounge talking to his wife, would not be."